IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL J. RANDLES,                          )
                                             )
              Plaintiff,                     )
                                             )
v.                                           )        No.  05-1374-WEB
                                             )
THE GALICHIA MEDICAL GROUP, P.A.             )
ERISA BENEFIT PLAN;                          )
JOSEPH P. GALICHIA, M.D.;                    )
STANDARD INSURANCE COMPANY; and              )
WILLIS OF KANSAS, INC. (formerly WILLIS      )
CORROON CORPORATION OF KANSAS),              )
                                             )
              Defendants.                    )
_____       )

**<u>Memorandum and Order</u>**

Plaintiff Michael J. Randles, M.D., a former employee of the Galicia Medical Group, P.A.,

brought this action claiming he has been wrongfully denied benefits under an employee welfare

benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

Plaintiff was an eligible participant in the Galichia Medical Group P.A. ERISA Benefit Plan, and

in December of 2000 he submitted a claim for long-term disability ("LTD") benefits based upon his

inability to work due to depression and other problems.  Defendant Standard Insurance Company

determined that plaintiff was disabled and paid him benefits for the period beginning April 23, 2000.

Standard terminated the benefits after two years, however, based upon a limitation in the Plan

pertaining to "Mental Disorder," which provided in part that payment of LTD benefits was "limited

to 24 months for each period of Disability caused or contributed to by a Mental Disorder."

Plaintiff's complaint alleges that the termination of his benefits was arbitrary, capricious, and

an abuse of discretion.  *See* Doc. 1.  He claims he has been wrongfully denied past benefits and

seeks recovery for such benefits under 29 U.S.C. § 1132(a)(1)(B). He also seeks a declaration that he is entitled to future benefits until the age of 65, and an award of prejudgment interest.

The following motions are now pending: Defendants Galichia Medical Group P.A. and Joseph P. Galichia, M.D. Motion to Dismiss (Doc. 14); Defendant Standard Insurance Company and Galichia Medical Group P.A. ERISA Plan Motion for Summary Judgment (Doc. 19); Plaintiff Michael J. Randles Motion for De Novo Review of Case (Doc. 25); Defendant Standard Insurance Company Motion to Strike Exhibits (Doc. 32); Defendant Willis of Kansas, Inc. Motion for Summary Judgment (Doc. 38); Plaintiff Michael J. Randles Motions for Summary Judgment (Docs. 41, 65); and Defendant Standard Insurance Company Second Motion to Strike (Doc. 55).

I. *Motion for Summary Judgment by defendants Standard Ins. Co. and Galichia Med. Group P.A. ERISA Benefit Plan.* (Doc. 19).

A. Defendant's Statement of Uncontroverted Facts.

1. The Galichia Medical Group, P.A. (hereinafter "Group") sponsored the Galichia Medical Group, P.A. ERISA Benefit Plan.

2. The Benefit Plan is an employee welfare benefit plan within the meaning of § 3(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(1) (ERISA).

3. Among other things, the Benefit Plan provides benefits to eligible qualifying participants in the event they become "totally disabled" within the meaning of the Group Long Term Disability Insurance Policy provided by the plan (referred to here as the LTD Plan).

4. According to the LTD Plan, an eligible participant is entitled to benefits during the Benefit Waiting Period and the Own Occupation Period if as a result of Sickness, Injury or Pregnancy, he/she is unable to perform with reasonable continuity the material duties of his/her own

occupation.

5. According to the LTD Plan, the "Benefit Waiting Period" is 90 days.

6. According to the LTD Plan, the "Own Occupation Period" for Class 1 Members, which included physicians such as plaintiff, was from the end of the Benefit Waiting Period to the end of the Maximum Benefit Period.

7. According to the LTD Plan, an eligible participant is entitled to benefits during the Any Occupation Period if as a result of Sickness, Injury or Pregnancy, he/she is unable to perform with reasonable continuity the material duties of any gainful occupation for which he/she is reasonably fitted by education, training and experience.

8. According to the LTD Plan, the "Any Occupation Period" pertaining to Class 2 Members is the period following the 24 month "Own Occupation Period" extending to the "Maximum Benefit Period." As plaintiff points out, the "Any Occupation Period" is inapplicable to Class 1 Members. Adm. Rec. 839-2011.

9. The LTD Plan has at all pertinent times provided, among other things, "Payment of LTD Benefit is limited to 24 months for each period of Disability caused or contributed to by a Mental Disorder." Adm. Rec. 839-2001.

10. In 1991 the LTD Plan provided, "Mental Disorder means a mental, emotional, behavioral, or stress-related disorder." Adm. Rec. 839-2001.

11. Effective March 1, 1997, the term "Mental Disorder" was amended to read:

> Mental Disorder means any mental, emotional, behavioral, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause, including any biological or biochemical disorder or imbalance of the brain. Mental Disorder includes, but is not limited to, bipolar affective disorder, organic brain syndrome,

3

schizophrenia, psychotic illness, manic depressive illness, depression
and depressive disorder, anxiety and anxiety disorders.

Adm. Rec. 839-2037.

12.  Plaintiff Michael Randles was employed by the Galichia Medical Group, P.A. on June 22, 1998.

13.  In December 2000, Plaintiff was a participant in the LTD Plan within the meaning of § 3(7) of ERISA.

14.  In December 2000, Plaintiff submitted a claim for LTD Plan benefits (hereinafter "Employee's Statement").

15.  In the Employee's Statement, signed by Plaintiff, Plaintiff stated that his illnesses were depression, obsessive compulsive personality, bi-polar type 2, osteopenia, sleep apnea, hypogonadism, morbid obesity, pernicious anemia, and vitamin B-12 deficiency.  Adm. Rec. 839-152.  Plaintiff also provided a written statement explaining his disability and referring to his attached attending physician's statements.  Adm. Rec. 839-152.

16.  Plaintiff listed T.A. Moeller, Ph.D., a psychologist, as his attending physician.  *Id.*

17.  Dr. Moeller had begun administering psychotherapy to Plaintiff in January of 2000.

18.  In 2000, Dr. Moeller completed an Attending Physician's Statement and provided a diagnosis of Plaintiff of major depression.  Adm. Rec. 839-149.

19.  In May 2000, Plaintiff submitted an Attending Physician Statement signed by Dr. Kenneth Williams, a psychiatrist.  Dr. Williams provided a diagnosis of Plaintiff of bi-polar disorder -- Type II, and "OCD" (obsessive compulsive disorder) and described plaintiff's symptoms as depression and irritability.  Adm. Rec. 839-150.

20.  Standard had a board certified psychiatrist, Dr. Esther Gwinnell, review Plaintiff's

4

medical files and she determined that Plaintiff was having "fairly severe psychiatric symptomatology" and that he "has a major mental illness, probably bipolar disorder."  Adm. Rec. 839-145.

21.  Standard determined that Plaintiff was disabled due to his mental disorder and paid him benefits for the period beginning April 23, 2000, the 90th day following the onset of the disability on January 24, 2000.  Adm. Rec. 839-406.

22.  Plaintiff filed a claim for unpaid wages against The Galichia Medical Group, P.A. before the Kansas Department of Human Resources (hereinafter "KDHR proceedings").

23.  In the KDHR proceedings, Plaintiff asserted among other things that he was permanently disabled as a result of a mental illness.

Plaintiff's claim for unpaid disability benefits in the KDHR proceeding was based upon the parties' employment agreement, which provided in part that if Plaintiff were to become permanently disabled during the contract term, the Galichia Group would continue Plaintiff's salary for 60 days following his ceasing to practice medicine as a result of the disability.  Adm. Rec. 839-276-75; 839-257.

24.  Douglas Hager acted as Presiding Officer of the KDHR proceedings and conducted three days of hearings.  At the conclusion of the proceedings, Presiding Officer Hager entered a 28-page initial Order in October of 2001.

25.  Presiding Officer Hager included 57 paragraphs of factual findings in the initial Order including the following:

a) In January 2000 Dr. Williams felt that Plaintiff was not able to practice medicine at that time and that Plaintiff's "primary issue was obsessive/compulsive features and some depression."

b) Dr. Moeller administered the Minnesota Multiphasic Inventory-2 (MMPI-2), which Hager found would be admissible as evidence in a Social Security disability determination.

c) Presiding Officer Hager wrote in paragraph 30 of his findings of fact: "The MMPI-2 test 'clearly reflected' a 'very strong depression' and an absence of manic activity 'almost to the point' that it 'concerned' and 'frightened' Dr. Moeller for Dr. Randles' sake.  Dr. Moeller explained that 'when depression is very high and mania is very low' on the MMPI-2 test's scales, 'as an individual gets better and responds to treatment, there's often a strong rebound -- reemergence of suicidal thinking and -- deterioration of further impulse.'"

d) In paragraph 31 of his findings, Hager stated that "[t]he Milan Clinical Multiaxial Inventory-III test 'reflected similar issues.'"

e) In paragraph 43 of his findings, Hager stated, "Dr. St. Clair's initial impression of Claimant was major depression.  Claimant was ultimately diagnosed as having bipolar affective disorder by Dr. St. Clair and Dr. Williams.  Bipolar disorder can cause a person to be permanently disabled.  Dr. Moeller 'certainly concurred' with the bipolar diagnosis."  Dr. St. Clair is a board certified psychiatrist who began treating Plaintiff in February 2003.

26.  Presiding Officer Hager in that initial Order also concluded that Plaintiff had become permanently disabled prior to January 31, 2000, as a result of his mental illness.  He wrote:

> Based upon the extensive record in this matter, it is the finding and
> conclusion of the Presiding Officer that Claimant became
> permanently disabled, as those terms were used in the parties'
> agreement, prior to its expiration on January 31, 2000. Although
> Claimant's first treating mental health professional, Dr.
> Williams, "did not come up with a specific time of how long"
> Claimant's disabling medical condition was, he agreed with Dr.
> Moeller's assessment because of his experience in the field of

6

> disability. Dr. Moeller has indicated repeatedly that Claimant is
> unable to continue the practice of medicine and specifically that he
> views Claimant as being permanently disabled. Claimant's third
> treating mental health professional, Dr. St. Clair, diagnosed Claimant
> as suffering from bipolar affective disorder, a psychiatric mental
> disorder which can cause permanent disability. In Dr. St. Clair's
> opinion, based upon his treatment of Claimant in early February,
> 2000, Claimant is permanently disabled from returning to his work
> as a physician and he became permanently disabled while employed
> by Respondent.

Adm. Rec. 839-257.

Presiding Officer Hager found, among other things, that the Galichia Medical Group, P.A.,

Dr. Galichia, and Verne Baker (CEO of the corporation) were liable to pay plaintiff wages and

benefits, including 60 days' salary for disability pay. Hager found that the Respondents had decided

not to renew Plaintiff's employment contract after being notified of Plaintiff's total disability, and

that instead of conducting a good faith investigation to determine whether the disability was

permanent, they issued notice of their intent to terminate him and turned the matter over to their

legal team. Hager found their conduct was "tantamount to an intent to do wrong or cause injury to"

Plaintiff, and he awarded statutory damages for willful non-payment of the wages and determined

that the individual Respondents were personally liable for the award. Adm. Rec. 839-258-53.

27. During 2001, Plaintiff was seen by Dr. Bruce Nystrom, a psychiatrist, because of

Plaintiff's "recurrent suicidal/homicidal/depression." Dr. Nystrom identified the "presenting

problem" as "recurrent depression -- obsessive compulsive."

28. Dr. Moeller wrote in his notes of June 5, 2001:

> He has very little understanding of how he is perceived socially and
> this includes his interactions with the medical school, the V.A.,
> previous partners, etc. His view of himself is as of a righteous
> crusader, and he appears completely unable to adopt a different
> interpersonal stance." There was some significant deterioration to an

agitated, tearful state once we talked about the upcoming hearing in some detail. I continue to see this gentleman as permanently incapacitated from practicing as a physician. His inadequate response to stressful situations make his decision making capacities somewhat suspect—especially as it relates to his patients' health and welfare.

29.   In June 2002, Dr. Dean Youngberg advised the Kansas Department of Insurance that Plaintiff was an 'obsessive compulsive individual who has manifested an addictive behavior. Dr Youngberg reported that "by history, he has been off alcohol since 1979, off tobacco since 1991 and has lost over 150 lbs. and maintained his weight since 1999." (Adm. Rec. 839-1982).

30. In August 2002, Dr. Michael Resnick, a board certified psychiatrist, reviewed Plaintiff's medical records at the request of Standard and concluded, inter alia, "I believe the primary diagnosis related to his work impairment is Personality Disorder mixed type with prominent Obsessive-compulsive, Narcissistic and Paranoid traits. In addition he suffers from Dysthymia and has been given the diagnosis of Bipolar disorder though this is by my estimate is uncertain. . . . I agree with other examiners that Dr. Randles is impaired and unable to practice internal medicine based on his mood disturbance and personality issues." (Adm. Rec. 839-2440-41).

31. By letter of January 9, 2002, Standard advised Plaintiff that his benefits would stop as of April 22, 2002, (the second anniversary of Plaintiff first receiving LTD Plan benefits), when the 24-month maximum benefit period for his Mental Disorders would end. (Adm. Rec.839-1658).

32. Plaintiff filed complaints with the Kansas Department of Insurance ("KDI"). The KDI determined in February 2002, "The contract limitation of 24 months is applicable to all persons covered under the Galichia Medical Group contract when the disability condition is caused or contributed to by a mental disorder. The limitation is clear and is not contrary to any Kansas Law." (Adm. Rec. 839-1679).

8

33. The KDI further determined in response to Plaintiff's complaint, "Based on the information available to us it appears that the Company's application of the policy's 2-year benefit limitation for nervous and mental conditions was reasonable and consistent with the policy provisions." (Adm. Rec. 839-1678).

34. By letter of September 11, 2002, Standard advised Plaintiff that it had reviewed his claim and believed that it had properly terminated his benefits after 24 months. (Adm. Rec. 839-2462-68).

35. By letter of October 9, 2002, the Quality Assurance Unit of Standard advised Plaintiff that it had completed its independent review of Standard's decision to close his LTD claim and Continued Life Insurance/Waiver of Premium claim and determined that Standard's determinations had been correct. (Adm. Rec. 839-2477-83).

36. Exhibit A attached to the Affidavit of Mark Sampson is a true, accurate and complete copy of the administrative record regarding Plaintiff's claim.

37. The plan document provides, inter alia: Except for those functions which the Group Policy specifically reserves to the Policy owner, we have full and exclusive authority to control and manager the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation and application of the Group Policy. (Adm. Rec. 839-2000) The term "we" as used in this paragraph refers to Standard Insurance Company. (Adm. Rec. 839-2015).

B.  Discussion.

Defendants Standard Insurance and the Galichia Medical Group P.A. ERISA Benefit Plan move for summary judgment.  They argue Standard's determination -- i.e., that Plaintiff had a mental disorder that caused or contributed to his disability -- was supported by substantial evidence.

9

They further assert that the Plan included a two-year limitation on benefits for disability caused or contributed to by a mental disorder.  As such, they contend plaintiff's claim for continued benefits was properly denied and judgment should be entered in their favor on the complaint.

Plaintiff's arguments are set forth in a 95-page Response to Summary Judgment as well as other filings.  The arguments are so numerous and wide-ranging that they are difficult to summarize.  To the best of the court's ability, the following represent plaintiff's main contentions.  First, plaintiff argues the court should apply a *de novo* standard in reviewing Standard's determination.  Second, plaintiff argues it was an abuse of discretion to deny continued disability benefits because his disability was  "based on the risk of returning to a ... hostile, emotionally abusive, manipulative, coercive environment..." caused by the defendants.  *See* Doc. 1 at 17.  Third, plaintiff contends he is being denied benefits promised in a document given to him by GMED, dated August 1, 1997, which contained a brief description of the Galichia Medical Group LTD Plan.  *See* Adm. Rec. 839-464.  Plaintiff contends this document constituted a summary plan description ( "SPD1") that promised disability benefits without any mental disorder limitation and without any "drug or alcohol restrictions."  He contends it was arbitrary and capricious to deny him benefits promised in the SPD1.  Fourth, plaintiff contends a Summary Plan Description dated March 1, 1991 -- which he refers to as "SPD2" -- was deceptive and defective under ERISA's requirements, that it contradicted SPD1, and that it contained an improper disclosure of the limitation on benefits for mental disorders.  Plaintiff alleges he was given SPD2 after he agreed to fund the LTD benefit.  He contends it was arbitrary and capricious of Standard to deny benefits based upon the limitation improperly disclosed in SPD2.  Plaintiff claims that because of defendants' failures to properly disclose the mental disorder limitation, he was unaware of the limitation until he made a claim for benefits.  Doc. 1 at

16. Further, plaintiff claims "[h]e relied upon the knowledge that 'no alcohol or drug restrictions' stated in SPD1 was a category of 'Mental Disorder,'" and he alleges that "overlooking a single sentence on page 13 [the mental disorder limitation in "SPD2"] is reasonable and consistent with due diligence" on his part. *Id.*

When an ERISA plan grants a plan administrator (or its delegate) discretion in administering the plan, the court will generally uphold its decisions unless they are arbitrary or capricious or an abuse of discretion. *Gaither v. Aetna Life Ins. Co.*, 388 F.3d 759, 767 (10th Cir.2004) (*citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). In this instance, plaintiff was provided coverage under a group LTD insurance policy as part of the Galichia Medical Group P.A. ERISA Benefit Plan. A Summary Plan Description received by plaintiff shortly after he was enrolled for coverage provided in part that, except for specific functions reserved to the Galichia Medical Group P.A., Standard Insurance Company has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation and application of the Group Policy." Adm. Rec. 839-445. Such a grant of authority was sufficient to confer discretion upon Standard in the interpretation and application of the policy to the plaintiff's claim.

"In applying the arbitrary and capricious standard, the decision will be upheld so long as it is predicated on a reasoned basis." *Adamson v. UNUM Life Ins. Co. of America,* 455 F.3d 1209, 1212 (10th Cir. 2006) (*citing Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir.1999)). Under this standard, there is no requirement that the basis relied upon be the only logical one or the best possible one. The reviewing court only inquires whether the administrator's decision resides "somewhere on a continuum of reasonableness-even if on the low end." *Id.* (*citing Kimber*, 196 F.3d

at 1098).   A lack of substantial evidence may indicate that a decision was an arbitrary and capricious.  *Id.* (*citing Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)).  "Substantial evidence" means evidence of a sort that a reasonable mind could accept as sufficient to support a conclusion.  *Id.*

If a plan gives discretion to an administrator who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there was an abuse of discretion.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.101 , 115 (1989).  The court must decrease the level of deference given to the administrator's decision in proportion to the seriousness of the conflict.  *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 826-27 (10th Cir. 1996).  In circumstances where an insurer doubles as the plan administrator,  "there is an inherent conflict of interest between its discretion in paying claims and the need to stay financially sound."  *Adamson*, 455 F.3d at 1213 (*citing Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1296 n. 4 (10th Cir. 2000).  Standard's position as the insurer and the delegate of the administrator with authority to construe the plan and determine claims arguably puts it in such a position.  In such circumstances, the courts typically apply a less deferential standard and place the burden on the plan administrator of showing the reasonableness of its decision.  "The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest."  *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004).  *Cf. Adamson v. UNUM Life Ins. Co. of America*, 455 F.3d 1209, 1213-24 (10th Cir. 2006).

With these principles of review in mind, the court turns to Standard's determination that the terms of the GMED Plan included a 24-month limitation on benefits for disability caused by a

mental disorder.  The term "employee welfare benefit plan" under ERISA means any plan, fund, or program established or maintained by an employer for the purpose of providing for its participants or beneficiaries, through the purchase of insurance or otherwise, various benefits, including benefits on account of disability.  29 U.S.C. § 1002(1).  The Administrator of an existing plan must furnish to each participant a "summary plan description" within 90 days after he becomes a participant. § 1024(b).  The Administrator must also file the plan description and other documents with the Government. § 1021(b).  By statute and regulation, the summary plan description (or "SPD") must be written in a manner that it can be understood by the average plan participant, and it must be sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan. § 1022(a).  The SPD must contain an extensive list of information, including: the name and type of administration of the plan; whether a group health insurance issuer is responsible for the financing and administration of the plan (and, if so, the name and address of such insurer); the name and address of the person designated as agent for service of process; the names and addresses of the administrator or any trustees; the plan's requirements respecting eligibility for participation and benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year; the procedures to be followed in presenting claims for benefits under the plan, including the governmental office through which participants may obtain assistance;  and the remedies available under the plan for the redress of denied claims.

Questions about the scope of benefits provided by a plan must be answered initially by the plan documents, applying the principles of contract interpretation. *Chiles v. Ceridian Corp.*, 95 F.3d

1505, 1515 (10th Cir. 1996). An SPD is considered part of the plan documents required by ERISA. *Id*. Because the SPD best reflects the expectations of the parties, the terms of the SPD control the terms of the plan itself if there is an actual conflict between the two. *See Charter Canyon Treatment Cent. v. Pool Co.*, 153 F.3d 1132, 1136 (10th Cir. 1998). A summary plan description which is silent on a specific term or issue, however, does not present an actual conflict and cannot prevail over the master plan document. *Id*.

There is no question that the SPD received by plaintiff shortly after he enrolled in the LTD Plan contained a 24-month limitation on payment of benefits for disability caused by a mental disorder. Plaintiff does not appear to dispute this, but contends a document given to him by GMED before he enrolled in the LTD Plan also constituted a summary plan description, and because it contained no such limitation he argues it prevails over the subsequent SPD. This first "SPD1" apparently consists of a single page, with the top half of the page containing a brief outline of the GMED LTD Disability Plan, including a "bullet" list of some thirteen "Plan Features." Adm. Rec. 839-464. The outline contains no complete sentences or explanation pertaining to the listed features. The bottom half of the page contains a brief explanation of the cost of the benefit and a table with age and "premium factor" variables allowing calculation of the premiums for coverage.

The court concludes as a matter of law that the "SPD1" cited by plaintiff did not constitute a summary plan description under ERISA. Numerous cases have addressed similar arguments by beneficiaries claiming that documents given them by plan sponsors constituted binding SPD's. For example in *Hicks v. Fleming Companies, Inc.*, 961 F.2d 537 (5th Cir. 1992), the plaintiff received a six-page booklet summarizing various benefits provided by the employer including a disability benefit, although under the actual terms of the employer's plan this individual was not eligible for

14

disability benefits.  The document did not purport to be an SPD and contained disclaimers stating

it was merely a summary and that benefits were subject to the terms in the various benefit plans.

The Fifth Circuit rejected plaintiff's claim that the booklet constituted an SPD, noting that Congress

did not intend the term "summary plan description"  to include every document that contains some

of the information required by § 1022(b).  Rather, the appropriate test for determining whether a

given document is an SPD is whether it "contains all or substantially all categories of information

required under 29 U.S.C. § 1022(b) and the DOL's regulations at 29 C.F.R. § 2520.102-3 for the

type of benefit in question." *Hicks*, 961 F.2d at 541.  The court adopted this "bright-line approach"

because "[i]f a document is to be afforded the legal effects of an SPD, such as conferring benefits

when it is at variance with the plan itself, that document should be sufficient to constitute an SPD

for filing and qualification purposes." *Id*. at 542.  *Cf. Kochendorfer v. Rockdale Sash & Trim Co.,*

*Inc.,*653 F.Supp. 612, 615 (N.D. Ill. 1987) (document is deemed an SPD if it contains all or

substantially all of the information the average participant would deem crucial to a knowledgeable

understanding of his benefits under the plan).  In *Palmisano v. Allina Health Systems, Inc.*, 190 F.3d

881 (8th Cir. 1999), the plaintiff claimed that a loose-leaf compilation describing various benefits

constituted a faulty but binding SPD.  After reviewing the statutory and regulatory requirements of

an SPD, the court rejected this argument, finding that "[t]he summary provided was so lacking in

detail that it cannot be deemed even a faulty SPD." *Id*. at 888.  The court noted that to hold

otherwise would undermine the principle that ERISA precludes oral or informal amendments to a

plan, by estoppel or otherwise. *Id*.  *See also Antolik v. Saks, Inc.*, 463 F.3d 796 (8th Cir. 2006).

The  "SPD1" cited by plaintiff fails to constitute an SPD under any of the foregoing

standards.  This one-page outline does not contain most of the information required by 29 C.F.R.

§ 2520-102-3, such as the address of the employer, the type of administration of the plan, the identification of the plan administrator, the identification of the agent for service, the identification of any trustees, specific requirements for eligibility, any detail about circumstances for disqualification or denial of benefits, any statement about authority to terminate the plan or eliminate benefits, any statement about rights and obligations of beneficiaries, the identification of the plan insurer, the procedures governing claims, or a statement of ERISA rights.  The document clearly did not contain all or substantially all of the categories of information required by ERISA.  Like the document in *Palmisano*, this document was so lacking in detail that it cannot be deemed even a faulty SPD.  Regardless of the fact that the document had no disclaimer,  no person reading this sheet could reasonably rely upon it as a complete summary of the plan's terms or the conditions and limitations on payment of benefits.  It was clearly only an outline of the plan's "features" or highlights rather than a substantive statement or complete summary of terms.  This much is obvious from the brevity of the document as well as the use of shorthand descriptions and cryptic references to provisions that are contained in other documents [e.g., "Return to Work Incentive included."].  The court thus rejects plaintiff's claim that the SPD1 constituted a binding promise that he would receive disability benefits without any limitation on benefits relating to a mental disorder.

By contrast to the "SPD1," the "SPD2" received by plaintiff was a 19-page summary of all aspects of the LTD benefit.  It included all or nearly all of the information required by ERISA statutes and regulations governing SPD's.  On page 3 of the SPD2, the basic disability benefit was described, and immediately following on the next page under the heading "Exclusions and Limitations," a preexisting condition exclusion was noted and the reader was directed to "See Exclusions and Limitations for this and other exclusions and limitations."  Adm. Rec. 839-455.

Under the heading of "Exclusions" on page 12, various exclusions from coverage were explained, including disability due to war, self-inflicted injury, or pre-existing condition.  Immediately following on the next page, under the heading "Limitations," the SPD set forth two limitations.  The second of these, under the heading of "Mental Disorder," stated that "Payment of LTD Benefits is limited to 24 months for each period of Disability caused or contributed to by a Mental Disorder."[1] The court must reject plaintiff's contention that the SPD2's disclosure of this limitation was deceptive or rendered obscure or that it somehow gives rise to a claim of equitable estoppel on plaintiff's part.  A plain reading of the document's terms reveals the 24-month benefit limitation for disability caused or contributed to by a mental disorder.  *See Administrative Committee Of Wal-Mart Associates Health And Welfare Plan*, 393 F.3d 1119, 1123  (10th Cir. 2004) (in construing ERISA plan, the court gives the language "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.").  This is true notwithstanding that the SPD arguably should have contained a clearer cross-reference describing specifically where the limitations could be found in the SPD.  *See* 29 C.F.R. 2520.102-2(b) (the restrictive provisions need not be disclosed in close conjunction with the

---

[1] The court notes that one version of the "SPD2" in the record contains no Table of Contents, while a second version does.  *Compare* Adm. Rec. 839-460 et seq. and 839-2015 et seq.  The Table of Contents in the second version indicated that "Limitations" were to be found on page 12 of the SPD.  Plaintiff alleges the SPD provided to him (apparently the first version) contained no Table of Contents.  Because Standard's motion does not appear to address this issue, and because the record does not otherwise show the reason for the two versions, the court assumes the truth of plaintiff's allegation for purposes of this motion.  The court also notes that the pagination for these two versions is somewhat different due to a blank area on page 2 of the first SPD.  *See* 839-457.  Apparently due to the blank area, the remaining pages of the first version are somewhat different than the second.  In the first version, the Limitation for Mental Disorder appears on page 13, whereas it appears on page 12 in the second version.  Although the unexplained reason for such discrepancies is vexing, the court concludes that the discrepancies are not material insofar as plaintiff claims he was misled by inadequate disclosure of the limitation.

description of benefits if adjacent to that description the page on which restrictions are described is noted).  Despite this, the limitation is clear and apparent to any reasonable person reading the SPD, and it precludes any potential claim by plaintiff that he is entitled to continuing disability benefits because the plan did not contain such a limitation or because plan documents misled him about extent of the benefit.  Notwithstanding plaintiff's numerous -- and conclusory -- allegations of "bad faith" on the part of the defendants, plaintiff has failed to cite evidence showing a genuine issue of material fact as to a claim of estoppel.  *See Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3rd Cir.1994) (to state a cause of action for equitable estoppel under § 1132(a)(3), an "ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances.");  *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir.1996) ( "we have consistently rejected estoppel claims based on simple ERISA reporting errors or disclosure violations, such as a variation between a plan summary and the plan itself, or an omission in the disclosure documents.").  *Cf. Callery v. U.S. Life Ins. Co. in City of New York*, 392 F.3d 401, 407-08 (10th Cir. 2004) (Tenth Circuit has yet to recognize equitable estoppel under ERISA).

Because the GMED LTD Plan indisputably contained the 24-month limitation,  the court turns to whether Standard's determination that plaintiff was subject to the limitation was arbitrary or capricious or was otherwise unreasonable.  The LTD plan initially provided the 24-month limitation for each period of disability "caused or contributed to by a Mental Disorder," with the term "Mental Disorder" defined as "a mental, emotional, behavioral, or stress-related disorder." Adm.Rec. 839-2001.  Pursuant to an amendment effective March 1, 1997, the term "Mental Disorder" was amended to mean:

> any mental, emotional, behavioral, psychological, personality,
> cognitive, mood or stress-related abnormality, disorder, disturbance,
> dysfunction or syndrome, regardless of cause, including any
> biological or biochemical disorder or imbalance of the brain.  Mental
> Disorder includes, but is not limited to, bipolar affective disorder,
> organic brain syndrome, schizophrenia, psychotic illness, manic
> depressive illness, depression and depressive disorders, anxiety and
> anxiety disorders.

Adm. Rec. 839-2037.  In a letter to plaintiff dated January 9, 2002, a benefit analyst for Standard made a thorough review of plaintiff's medical history and found "the evidence in your claim file supports that you are unable to perform the Material Duties of your Own Occupation due to bipolar disorder and major depression."  Adm. Rec. 839-117.  The analyst found that these conditions are Mental Disorders as defined by the policy.  *Id*. at 115.  After reviewing numerous doctor reports relating to plaintiff's various physical conditions -- including obesity, hypogonadism, osteopenia, diabetes, anemia, and sleep apnea -- the analyst found no medical evidence that plaintiff was disabled due to any of these other conditions, either alone or in combination with each other.  The analyst noted there was some indication in the medical records that plaintiff may have cognitive deficits, and as a result Standard had scheduled an independent medical examination to determine the extent and cause of any such deficits.  The analyst said the examination had been canceled, however, after plaintiff made various demands (including a demand that he be able to record the examination and an insistence that the examining physician agree that the examination would give rise to a physician-patient relationship).  *Id*. at 116.  *See* Adm. Rec. 839-402.  The letter stated that because plaintiff's disability was caused or contributed to by a mental disorder, the 24-month limitation on payment of benefits would be applied.  Adm. Rec. 839-115.

As the defendants point out in their motion for summary judgment, there was abundant evidence before Standard that defendant's disability was in fact caused or contributed to by a mental

19

disorder.  When plaintiff submitted his claim for disability, he included depression, obsessive compulsive personality, and "bipolar type 2" in the description of his illness.  Adm. Rec. 839-153. He also noted a "combination of physical + occupation related stressors resulting in suicidal/homicidal depression."  *Id.*  He submitted attending physician statements from Dr. Williams, a psychiatrist, who made a diagnosis of  "Bipolar Disorder Type II / OCD [Obsessive Compulsive Disorder], *id.* at 150, and from Dr. Moeller, a psychologist, who diagnosed "Major Depression." *Id.* at 149.  Standard subsequently had Dr. Esther Gwinnell, a psychiatrist, review plaintiff's file.  She stated that she concurred with Dr. Moeller "that Dr. Randles has a major mental illness, probably bipolar disorder by my assessment, but certainly major depressive disorder;..." Adm. Rec. 839-145. Clearly, Standard had a substantial basis in the evidence for finding that plaintiff's disability was caused in whole or in part by a mental disorder.  All of the foregoing diagnoses qualify as "mental disorders" under the policy definition.  And as Standard points out, the limitation applies regardless of the cause of the mental disorder, so plaintiff's argument that defendants' "hostile work environment" caused his depression is unavailing insofar as his ERISA claim is concerned. Additionally, plaintiff provided no substantial medical evidence to establish that he had a disability arising from a condition that was not caused or contributed to by a mental disorder.

After the initial determination by Standard, plaintiff produced additional materials in which he claimed his disability was caused not by a mental disorder but was caused by his adherence to a "12-step" treatment program for his addictions to alcohol, nicotine, and over-eating.  Plaintiff argued that "complete honesty" was essential to overcoming these addictions, and that his scrupulous insistence upon honesty and ethics was the reason he could not continue to work as a physician.  At plaintiff's request, some of his doctors wrote letters in support of his claim.  Dr.

Moeller noted that plaintiff had recovered from a variety of compulsive behaviors, including alcohol abuse and overeating, and said that plaintiff believed these compulsive behaviors have played a significant part in his disability.  *See* Adm.Rec. 839-2467.  Dr. Moeller stated that an individual's diligence and honesty in carrying out a 12-step recovery program for such behaviors "can often adversely affect his ongoing relationships with colleagues and administrative/clinical supervisors," and he believed this was the case for Dr. Randles.  "As such," he stated, "I believe his alcoholic and other compulsive behaviors and the recovery from them has figured prominently in disabling him from practicing his profession."  *Id*.  Dr. St. Clair wrote a letter noting plaintiff had followed the "AA" model to maintain control of sobriety and compulsive overeating, as well as "circadian integrity, and mood disorder."  Adm. Rec. 839-2466.  He stated that "[m]orbid obesity and obstructive sleep apnea with inappropriate daytime sedation are socially stigmatized with documented discrimination, psychological and professional consequences.  Coupled with retaliation for whistle blowing, irreversible damage to Mr. Randles reputation has occurred.  The consequences of his injuries and illness do not allow him to return as a primary care physician...."  *Id*.  Dr. Youngberg wrote a letter confirming that plaintiff had manifested an addictive behavior disorder with addiction to alcohol, tobacco and an eating disorder resulting in morbid obesity and sleep apnea, but also noted he had been off alcohol since 1979, off tobacco since 1991, and had lost over 150 pounds and had maintained his weight since 1999.  Adm. Rec. 839-1982.  Dr. Nystrom wrote a letter setting forth plaintiff's theory of how he was disabled because the "open honesty" required by his 12-step recovery program "has made it impossible for him to ethically practice medicine ... and has also caused irreparable harm to his professional reputation amongst his peers and colleagues."  839-1984.  Dr. Nystrom stated, however, that "there is no current disorder present that

21

would disable him from the practice of medicine." *Id.*

In response to this and other evidence, Standard had another psychiatrist, Dr. Michael Resnick, review plaintiff's records. Dr. Resnick is board-certified in psychiatry with a subspecialty certification in addictive psychiatry. *Id.* at 2464. He found that the primary diagnosis related to plaintiff's work impairment was Personality Disorder mixed type with prominent Obsessive-compulsive, Narcissistic and Paranoid traits. Adm. Rec. 839-2441. He noted plaintiff has alcohol and nicotine dependence but that both were in full sustained remission, and that Dr. Randles also reported an addictive eating disorder although Dr. Resnick said such a disorder was not recognized by the DSM-IV. Dr. Resnick found plaintiff was not impaired from the practice of medicine because of his addictive disorders. He observed that plaintiff had had long periods of successful practice despite being in recovery from these addictions, and said the vast majority of physicians in recovery from such addictions were able to return to practice unless there were co-occurring physical or mental health issues. He found it was Dr. Randles' personality disorder which caused him to be unable to successfully practice medicine, not his addictions or his insistence upon honesty, and he rejected suggestions from plaintiff's physicians that plaintiff's 12-step recovery program was incompatible with a return to practice. Dr. Resnick opined that these physician letters "seem to be in response to considerable pressure brought to bear by the patient once the 24-month time limitation on disability payments for mental illness were exhausted." *Id.* at 2440. He said he agreed with the other examiners who found that plaintiff was impaired and unable to practice internal medicine due to his mood disturbance and personality issues. *Id.*

In light of Dr. Resnick's assessment, Standard conducted additional reviews to determine whether the supplemental opinions of plaintiff's doctors were supported by substantial evidence in

the record.  A benefit analyst observed that records from Dr. Nystrom indicated he believed, like Dr.

Resnick, that plaintiff was not disabled as a result of his addictive behaviors -- despite indications

in Dr. Nystrom's notes that plaintiff had strongly advocated being declared disabled for insurance

purposes.  Adm. Rec. 839-2463.  Standard's analyst discounted the more recent opinions of Drs.

Moeller and St. Clair,  noting it was not until after Standard had invoked the 24-month limitation

that plaintiff "began to aggressively pursue a change in [his] diagnosis to addiction disorder."  *Id*.

She further observed (as had Dr. Resnick) that plaintiff had shown an ability to practice internal

medicine for at least 20 years while his alcohol addiction was in remission, at least 8 years while his

nicotine addiction was in remission, and for an unspecified period while he was obese, facts which

contradicted the more recent assertions that plaintiff was disabled due to these addictions or because

of the 12-step treatment program for them.  The analyst also noted plaintiff's argument that his

ability to work was hampered by a damaged reputation, but she pointed out that damage to

reputation was not a disability covered by the LTD policy.  She acknowledged that Dr. Resnick's

opinion was based upon a review of records rather than an examination of the plaintiff, but she

found that the opinion was supported by the information in plaintiff's medical records.  Adm. Rec.

839-2463.[2]

Like its initial determination, Standard's supplemental determination was supported by

substantial evidence.  The opinion of Dr. Resnick clearly supported a determination that plaintiff

was disabled by a mental disorder rather than because of his addictions or the 12-step recovery

program.  Dr. Resnick's opinion was based upon a thorough review of relevant medical records and

---

[2] The supplemental review discussed above was followed by an additional review by Standard's Quality Assurance Unit, which also concluded that the determination was supported by the record.  *See* Adm. Rec. 839-2483-77.

prior examinations and rationally explained why neither the addiction disorder or the 12-step treatment should be considered the cause of plaintiff's disability.  It was also consistent with the opinions of plaintiff's treating physicians prior to the advent of the dispute over the 24-month limitation on benefits.  Dr. Nystrom's opinion provided further support for the finding that plaintiff was not disabled due to his addiction disorder or the 12-step program.  Standard has also shown a reasonable basis for rejecting the supplemental opinions of Drs. Moeller and St. Clair.  The contention that plaintiff was disabled as a result of his addictions or the 12-step program is contradicted by his lengthy history of successful medical practice, and the supplemental medical opinions submitted by plaintiff fail to reconcile that contradiction.  The record shows that plaintiff did not become disabled from practicing as a physician until he began experiencing severe psychological symptoms in early 2000.  As Standard indicated, these supplemental opinions also appeared to venture somewhat outside the field of medicine by speculating that plaintiff was unable to work due to damage to his reputation or as a result of discrimination.  Even if true, such causes would not fall under the coverage for physical disease or injury to the body provided by the disability policy.  At best, these supplemental opinions might support a finding that plaintiff's physical problems, including his addictions, contributed to or aggravated his depression and/or personality disorder, but would not have been disabling on their own absent the mental disorder. Under the circumstances, Standard had a reasonable basis for adopting the assessment of Dr. Resnick and for relying on the substantial medical evidence showing that plaintiff's disability was caused or contributed by a mental disorder.

In sum, Standard's determination that plaintiff is not entitled to continuing disability benefits was supported by substantial evidence and was reasonable in view of the record.  Because plaintiff

has shown no grounds for relief under 29 U.S.C. § 1132(a)(1)(B), the court finds the motion for summary judgment of Standard and the GMED ERISA Plan should be granted with respect to any such claim.

Plaintiff's complaint contains numerous other allegations as well. For example, in what might be considered allegations of breach of fiduciary duty under § 1132(a)(3), plaintiff alleges that the Plan "submitted an inaccurate, prejudicial, and biased report to Standard," that GMED terminated his employment in bad faith, that defendant Willis produced a misleading SPD ("SPD1"), and that the Plan and Standard engaged in unspecified "self serving actions." These allegations likewise fail, however, because plaintiff has failed to cite evidence showing a genuine issue of material fact as to any ERISA claim for breach of fiduciary duty. *Cf. Romero v. Allstate Corp.*, 404 F.3d 212, 226 (3d Cir.2005) ("In order to make out a breach of fiduciary duty claim..., a plaintiff must establish each of the following elements (1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation."). For the reasons noted previously, plaintiff has failed to establish a material misrepresentation in connection with the "SPD1" or with respect to the benefits promised him under the Galichia Medical Group P.A. ERISA Plan. To the extent plaintiff asserts a claim for breach of contract under state law for the failure to pay continuing benefits, any such claim is preempted by ERISA. Similarly, plaintiff's allegations that the defendants conspired to "deceive, harm, and injure" him are preempted insofar as they are based on state law. *See Settles v. Golden Rule Ins. Co.*, 927 F.2d 505, 509 (10th Cir. 1991) ("common law tort and breach of contract claims are preempted by ERISA if the factual basis of the cause of action involves an employee benefit plan."); *Milton v. Scrivener, Inc.*, 53 F.3d 1118,

25

1121, n.3 (10th Cir. 1995) (claims alleging fraud with intent to deprive plaintiff of retirement benefits was preempted by ERISA). In sum, the court finds that the motion for summary judgment should be granted with respect to all claims in the complaint.

II. *Defendants Joseph P. Galichia, M.D. and The Galichia Medical Group P.A. Motion to Dismiss (Doc. 14)*. Defendants Joseph P. Galichia, M.D. ("Galichia") and The Galichia Medical Group P.A. ("GMED") move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss any claims against them. Noting that plaintiff's complaint is not entirely clear whether they were intended to be named as defendants, they argue that even if the complaint is so construed, the facts alleged will not support any claim for relief against them.

These defendants argue any claim by plaintiff under § 1132(a)(1)(B) is properly made only against the benefit plan itself. *Citing, inter alia, Miller v. Pension Plan for Employees of Coastal Corp.*, 780 F.Supp. 768, 773 (D. Kan. 1991) (dismissing claim against employer where it was undisputed that employer was not proper party). They contend plaintiff has not asserted any claim for relief other than the § 1132(a)(1)(B) claim for benefits and clarification of the right to future benefits. Defendants note the complaint does contain a reference to § 1132(c), which provides in part that penalties may be imposed upon a plan administrator who fails to timely respond to a beneficiary's written request for certain information. Defendants argue Dr. Galichia cannot be liable under this provision, however, because plaintiff has alleged that GMED, rather than Dr. Galichia, was the plan administrator. As for GMED, defendants argue plaintiff has failed to allege facts showing a specific written request for plan documents that has not been satisfied. Even if the complaint could be construed to allege such a request, defendants argue any such claim is precluded because the complaint itself shows that at the relevant times plaintiff received the plan documents

required by the statute.  Moreover, they argue plaintiff suffered no prejudice from any failure to provide plan documents and the court could thus find no penalty should be imposed.  Defendants also note that the complaint contains references to theories such as breach of contract, tortious conduct, and fraud, and they argue any such claims are preempted by ERISA.  Lastly, these defendants argue any claim or cause of action against them based upon a claim of denial of unpaid wages or any other theory relating to plaintiff's employment with GMED is barred by the statute of limitations, by the failure to exhaust administrative remedies, and/or by the doctrines of res judicata and collateral estoppel.

Plaintiff's response contains a detailed and wide-ranging discussion of factual allegations, many of which are not material to the issue at hand.  The court is mindful of its obligation to liberally construe plaintiff's complaint because he is proceeding *pro se.  Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  This standard means that if the court can reasonably read the pleadings to state a claim upon which relief could be granted, it should do so despite plaintiff's failure to cite properly legal authority or his confusion of various legal theories.  *Id*.  At the same time, it is not the proper function of the court to act an advocate for plaintiff or to supply additional factual allegations to round out his complaint.  *Id*.  *See Whitney v. State of New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).  The broad reading of a *pro se* complaint does not relieve a plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based.

Among other things, plaintiff's response asserts that all relevant documents identify the Galichia Medical Group P.A. (or "GMED") as the Plan Administrator.  He contends dismissal of the Plan Administrator on the pleadings would be improper where "the Plan is accused of egregious acts and blatant disregard" for its ERISA obligations.  Doc. 24 at 2.  Plaintiff says the proper

defendant in the case "has already been identified as the PLAN," but that "[i]n all matters relevant to the basis of the complaints made by Plaintiff against the PLAN they are equally applied to all of the co-Defendants" because "[e]ach had a moral and legal responsibility to make sure that no deception or improper act was committed by another,..." *Id*. Insofar as Dr. Galichia is concerned, plaintiff asserts that plan documents identified him as the agent for legal service on behalf of the Plan, so the action was served on him. *Id*. Plaintiff further states his belief that Dr. Galichia "is the Plan Administrator as well [] by virtue of his position with respect to GMED." *Id*. at 3.

The gist of plaintiff's claim is for wrongful denial of benefits allegedly due under the Plan and for clarification of his rights to future benefits. Doc. 1 at p. 8. Such a claim falls squarely under 29 U.S.C. § 1132(a)(1)(B). For the reasons discussed above pertaining to Standard's Motion for Summary Judgment, the court finds the defendants are entitled to judgment as a matter of law on this claim. Plaintiff has failed to establish any issue of material fact with respect to the application of the 24-month limitation on benefits. Moreover, § 1132(d) provides in part that an employee benefit plan may be sued under this portion of ERISA and that any money judgment against the plan shall be enforceable only against the plan and not against any other person unless liability against that person is established in his individual capacity under some other provision of ERISA. Insofar as his claim for benefits under the Plan is concerned, plaintiff has not alleged any facts that would render Dr. Galicia or GMED liable in an individual capacity. Standard, acting on behalf of the Plan, clearly made the decision to deny continuing benefits, and plaintiff has alleged nothing other than surmise to show that the other defendants bear individual responsibility for the decision. Accordingly, insofar as plaintiff is asserting a claim for benefits under the Plan, the court concludes that these defendants are entitled to dismissal of the complaint. *Cf. Musmeci v. Schwegmann Giant*

28

*Super Markets, Inc.*, 332 F.3d 339, 349 (5th Cir. 2003) (actions may be maintained against employer in certain circumstances, such as when the employer made the decision to deny the benefits).

Plaintiff's complaint also asserts, among other things, that "in consideration of the failure of all defendants to provide PLAN documents to Randles in a timely manner, even after formal request," the court "may consider [a] grant of statutory penalties for failure to provide these documents as provided under ERISA 502(c)(2).  Doc.1 at ¶ 44.  In other parts of the complaint, plaintiff alleges that the Plan failed to provide him with a March 1, 1997 amendment to the disability policy (adopting a detailed definition of "Mental Disorder") despite a formal request for all plan documents in July 2003.  Doc. 1, ¶ 25.  Plaintiff also alleges that the Plan failed to provide him with a "Renewal Letter" dated July 1, 2000.  *See* Doc. 1 at ¶ 33.  As an initial matter, plaintiff's vague allegation that he made a "formal request" for plan documents does not show the existence of an appropriate written request specifying what documents were requested.  But even assuming plaintiff has stated the factual predicate for a claim under some provision of § 1132(c), the court would decline in these circumstances to impose any penalty.  Plaintiff complains that he did not timely receive a copy of the 1997 amendment to the plan's definition of "mental disorder," but the conditions with which plaintiff was diagnosed (including major depression, bi-polar type II, and personality disorder mixed type) would clearly be classified as "mental disorders" regardless of which definition was applicable.  And as the court noted previously, the 24-month limitation for disability caused by mental disorder was disclosed in the "SPD2" received by plaintiff.  It is also clear from the allegations in the complaint that plaintiff did receive a copy of the amendment at some point in the claims process, although perhaps not in a timely manner.  Under the circumstances, the facts alleged by plaintiff do not warrant the imposition of any liability under §

1132(c).  Similarly, plaintiff's allegation that he did not receive a July 1, 2000 renewal letter is of no relevance to his claim and does not warrant the imposition of liability.  *Cf. Dube v. J.P. Morgan Investor Services*, 2006 WL 2924944 (Unpublished; Text available in Westlaw) (1st Cir., Oct. 13, 2006).  *See also Deboard v. Sunshine Min. & Refining Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000) (factors such as absence of prejudice and bad faith may be taken into account).   In sum, the court finds the defendants Dr. Galichia and the Galichia Medical Group P.A. are entitled to dismissal of any and all claims against them in plaintiff's complaint.

III.  *Motion for Summary Judgment of Defendant Willis*.

Defendant Willis of Kansas, Inc. moves for summary judgment on grounds similar to those set forth above.  It argues that the Plan itself is the only proper defendant on plaintiff's claim for wrongful denial of benefits.  Doc. 39 at 3.  It further argues that any state law claims against it are preempted by ERISA.  *Id*. at 3-4.  In response, plaintiff asserts that each of the defendants "was obligated by ERISA Law and DOL regulation to provide an employee benefit Plan free of deception, misrepresentation, deceit, and self serving conflict of interest."  Doc. 50 at 2.  He also argues -- without citation to the record -- that defendant Willis was actively involved in the day-to-day administration of the plan.  *Id*.

For the reasons previously expressed by the court, the court finds that defendant Willis is entitled to summary judgment on plaintiff's claims.  The only identifiable claim plaintiff makes against Willis is that it was responsible for the "SPD1" which plaintiff claims was either a binding SPD or a misrepresentation of the available disability benefit upon which he relied.  The court rejected both of those arguments above in reviewing plaintiff's claim for wrongful denial of benefits.  To the extent plaintiff's response attempts to rely upon potential claims under state law, plaintiff has

failed to allege or show the existence of any viable state law claim not preempted by ERISA. Accordingly, the court determines that defendant Willis is entitled to summary judgment on plaintiff's claims.

IV. *Remaining Motions*.

Plaintiff filed a Motion for De Novo Review (See Docs. 25 and 26) that is largely a reiteration of his responses to the defendants' motions. For the reasons stated above, plaintiff's motion is denied. Standard and the GMED ERISA Plan have filed two Motions to Strike (Docs. 32 and 55) which argue that various exhibits submitted by plaintiff should be stricken because they were not part of the administrative record. The court determines that these motions should now be denied as moot. Plaintiff has filed two motions for summary judgment (Docs. 41, 65) which the court denies for the reasons stated above.

V. *Conclusion*.

The following motions are hereby GRANTED: the Motion to Dismiss of defendants Joseph P. Galichia, M.D., and The Galichia Medical Group, P.A. (Doc. 14); the Motion for Summary Judgment of defendants Standard Insurance Company and Galichia Medical Group, P.A. ERISA Benefit Plan (Doc. 19); and the Motion for Summary Judgment of defendant Willis of Kansas, Inc. (Doc. 38).

The following motions are hereby DENIED: plaintiff's Motions for de novo review (Doc. 25 and 26); defendant Standard's Motions to Strike (Docs. 32 and 55); and plaintiff's Motions for Summary Judgment (Docs. 41 and 65).

In accordance with the foregoing rulings, it is ordered and adjudged that the plaintiff Michael J. Randles, M.D. shall take nothing on his claims and that the action be dismissed. The Clerk is

directed to enter judgment accordingly.  IT IS SO ORDERED this  18th   Day of December, 2006,

at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge